UNITED STATES of America

v.

Anthony WIGGINS, Defendant.

No. Crim.A. 98–409(EGS).

United States District Court,
District of Columbia.

June 20, 2002.

Charles Joseph Harkins, Jr., Amy Jeanne Conway, Julius Rothstein, Anthony Barkow, U.S. Attorney's office, Washington, DC, for U.S.

Erica Hashimoto, Assistant Federal Public Defender, Washington, DC, for Anthony E. Wiggins.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

The defendant, Anthony Wiggins, was arrested on November 12, 2001 for felony possession of a firearm by a felon. A warrant for his arrest was issued on November 24, 1998. This warrant was executed on Wiggins nearly three years later, on November 14, 2001. Defendant moves the Court to dismiss this matter for violation of Wiggins' constitutional speedy trial rights. In addition, he moves to suppress evidence and statements allegedly seized in violation of Wiggins' Fourth Amendment rights.

Upon careful consideration of defendants' motions, the responses and replies thereto, the entire record herein, and the applicable statutory and case law, the Court GRANTS defendant's motion to dismiss for violation of his speedy trial rights and GRANTS defendant's motion to suppress statements and evidence.

## I. Constitutional Speedy Trial Violation

At the hearing on defendant's motion to dismiss for violation of speedy trial rights, the Court heard testimony from William Bonk, a Supervisory Deputy U.S. Marshal who supervises the warrant squad, and from John Triplett, a Metro Transit Police Captain. The parties also stipulated to a proffer by defense counsel regarding the investigation, in which she would have engaged, had the case been prosecuted at an earlier time. All of the evidence clearly demonstrated that the government failed to notify Wiggins of the charges pending against him and, for close to three years, failed to take any action whatsoever in an attempt to execute the outstanding warrant for his arrest.

### A. Hearing Testimony

On November 24, 1998, a grand jury returned a one-count indictment in this Court charging Wiggins with possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). That same day, a warrant for Wiggins' arrest was issued by United States Magistrate Judge Alan Kay.

The government, in order to explain the delay in executing the warrant for Wiggins' arrest, presented extensive testimony regarding the warrant systems used by the Marshal Service and the Metro Transit Police.

The government's first witness, Deputy William Bonk, has been employed by the Marshal Service for twelve years and has supervised the warrant squad for three years. Deputy Bonk explained that the warrant squad handles two types of warrants: Class 1 warrants and Class 2 warrants. Class 1 warrants are those warrants, for which the Marshal Service bears responsibility for ensuring that they are entered into the National Crime Information Center ("NCIC") database, and for which the Marshal Service has the apprehension responsibility. The Class 2 warrants are warrants that originate from investigations by other law-enforcement agencies. The Marshal Service makes an entry of a Class 2 warrant in its database and then files the warrant until such time as another law-enforcement agency brings the person in question into custody. The distinction between Class 1 and Class 2 warrants has been in place since at least 1987 and, according to Deputy Bonk, is a national policy manifested in various memoranda of understanding between law enforcement agencies.

Deputy Bonk testified that the Marshal Service received a warrant for the defendant, Anthony Wiggins, that was issued by Magistrate Judge Alan Kay of this Court

on November 24, 1998. This was a Class 2 warrant, in that it originated from an agency other than the Marshal Service. The Marshal Service, therefore, did not have investigative responsibility, but apparently ran a check through the Washington Area Law Enforcement System ("WALES") and NCIC for other outstanding warrants and prior offenses on December 1, 1998. There did not appear to be any other warrants for the defendant on December 1, 1998. The Marshal Service also checked with the D.C. Jail to ensure that the defendant was not in custody at the jail.

Deputy Bonk explained that the Marshal Service does not generally enter Class 2 warrants into NCIC. The Marshal Service would only enter a Class 2 warrant into NCIC if it had received a written request. The defendant's file does not show that the Service received any written request or notation asking it to enter the warrant into NCIC. At the time that the Marshal Service ran its check for other outstanding warrants in NCIC, it was clear that the warrant in question in this matter had not been entered into the NCIC database. However, the warrant itself directs the Marshal Service to arrest the defendant pursuant to an indictment.

At the time that Wiggins was indicted in this case, he had recently been released in Superior Court Case No. F9855–97. He was arrested in the Superior Court case in December 1997, but the government dismissed the charges on September 22, 1998, apparently because it had not obtained an indictment within the requisite time period. On February 10, 1999, an indictment was filed in his Superior Court case, and an arraignment notice was mailed to his home. Wiggins received the notice and appeared for arraignment on February 23, 1999. He entered a guilty plea in that case on April 26, 1999, and was sentenced on October 12, 1999 to 2–6 years.

The Marshal knew Wiggins' home address, the same home address where Wiggins later received an arraignment notice in his Superior Court case. However, because the Marshal Service attached a Class 2 priority to the warrant issued by Judge Kay, no action was taken by the Marshal Service on the warrant.

Deputy Bonk testified that the Marshal Service did not enter the warrant for Wiggins' arrest into the NCIC database. No one from the Marshal Service sought to locate the defendant, or to apprehend him, and no effort was made to monitor whether the defendant appeared in D.C. Superior Court. The absence of such efforts was due primarily to the status assigned to the warrant, as Deputy Bonk testified that the Marshals in the District Court regularly check their Class 1 detainers against correctional facilities' records. Deputy Bonk testified that the Marshal Service had jurisdiction to arrest the defendant, but that, absent a request by another agency or a judicial officer or U.S. attorney, the Service would not arrest a person for whom there was a Class 2 warrant.

The fate of the 1998 warrant for Wiggins' arrest was pre-ordained by the fact that it originated with the Metro Transit Police. It would appear that Metro Transit warrants are a rare occurrence in this Court, as Deputy Bonk testified that, in his 12 years of experience, he had only seen two cases involving warrants issued by the Metro Transit Police. The government's second witness, Captain John Triplett, having worked twenty-seven years at Metro Transit Police, also testified that, to his knowledge, this case is only the second instance involving a felony warrant, originating with the Metro Transit Police, in federal court.

Captain Triplett is in charge of the Criminal Investigation Division and the Warrant Squad. He testified that the Metro Transit Police do not enter warrants in the District of Columbia into NCIC or any other database. Until the eve of the hearing when Captain Triplett learned of the circumstances surrounding Wiggins' warrant, Metro Transit Police had assumed that the warrant office of D.C. Superior Court entered into NCIC all the warrants in the District of Columbia, including those originating in federal court.[1]

Wiggins began serving his sentence in his Superior Court matter on October 12, 1999. He was incarcerated at Lorton Correctional Complex and, when that institution closed in the fall of 2001, the warrant for the defendant's arrest came to the attention of the Marshal Service. Deputy Bonk testified that he received an e-mail from Michelle Lee of the Bureau of Prisons on November 9, 2001, which included a list of several inmates who were scheduled to be transferred from Lorton to the BOP on November 15, 2001. One of the inmates scheduled for transfer was the defendant, Anthony Wiggins. Deputy Bonk checked all the names sent to him by Ms. Lee for open, unexecuted warrants and discovered the warrant for the defendant's arrest issued by Magistrate Judge Kay in November 1998, approximately two years earlier.

The government agreed to defense counsel's proffer that, had the warrant on Wiggins been executed three years ago, and the information about the case come to her at that time, she would have taken steps to investigate the factual allegations made by the government. Specifically, she would have asked her investigator to search for and interview possible witnesses at the Metro Station stop where Wiggins was arrested. Three years subsequent to the events in question, defense counsel concluded that her investigator would be unlikely to find any witnesses, and if such witnesses were found, that their specific memories would have faded such that the defense would be unlikely to present their testimony. Tr. 3/8/02 at 61.

## B. Legal Analysis

■  The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const., amend. VI. The Supreme Court has characterized this right as "one of the most basic rights preserved by our Constitution." *Smith v. Hooey,* 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). Recognizing that, "[o]n its face, the Speedy Trial Clause is written with such breadth that, taken literally, it would forbid the government to delay the trial of an 'accused' for any reason at all," the Supreme Court has outlined "four separate inquiries" that inform courts' analysis of alleged speedy trial right violations. *Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). *Doggett* identifies the following factors for courts' consideration:

(1) "whether delay before trial was uncommonly long";

---

**1.** Captain Tripplet testified that usual procedures called for a Metro Transit Police Officer to apply for a warrant, have the application screened by the U.S. Attorney's office, seek a judge's signature on the warrant, and then deliver the warrant to the warrant office in D.C. Superior Court. Thus, Captain Triplett assumed that the D.C. Superior warrant office would enter a Metro Transit warrant into NCIC even if the warrant originated in this Court.

(2) "whether the government or the criminal defendant is more to blame for that delay";

(3) "whether, in due course, the defendant asserted his right to a speedy trial"; and

(4) "whether he suffered prejudice as the delay's result."

505 U.S. at 651, 112 S.Ct. 2686 (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972)). Since his first appearance in this matter, the defendant has continuously asserted his speedy trial rights, and clearly satisfies the third criterion. Thus, the Court need only focus on whether the delay here was uncommonly long, the comparative fault of the government and defendant in causing that delay, and any resulting prejudice to the defendant from the delay.

In *Doggett,* there was an "extraordinary 8½ year lag between Doggett's indictment and arrest," that the Court held clearly triggered the speedy trial inquiry. *Id.* at 653, 112 S.Ct. 2686. Here, there is an approximately three-year delay in executing the warrant for Wiggins arrest. *Doggett* remarked in a footnote that "lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Id.* at 653 n. 1, 112 S.Ct. 2686. Without yet deciding that a presumption of prejudice should be applied in this case, the Court finds that a three-year delay in executing an arrest warrant "clearly suffices to trigger the speedy trial enquiry...." *Id.* at 653, 112 S.Ct. 2686.

With respect to the second *Barker* criterion, the government is clearly at fault in the delay in executing Wiggins' warrant. *Doggett* noted that, "if the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail." 505 U.S. at 656, 112 S.Ct. 2686. The Court further opined that "[t]he Government ...

can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice." *Id.* at 657, 112 S.Ct. 2686.

*Doggett* described "official negligence" in prosecuting a criminal matter as lying somewhere between diligent prosecution and bad-faith delay. While the *Doggett* court characterized the government's efforts to locate the defendant as "negligent," in *Doggett,* the police went to the defendant's house and to his parents' house. After learning from the defendants' parents that he was abroad, the police then attempted to locate the defendant overseas. Although the police entered defendant's information into a computer system, the computer entry expired before the defendant re-entered the country.

■ In contrast, the government made no effort to execute the warrant for Wiggins' arrest at his home address, or elsewhere. No law enforcement officer visited Wiggins' house. Yet, the address for Wiggins listed on the arrest warrant is the same address to which the Superior Court, approximately three months later sent an arraignment notice. Wiggins appeared in Superior Court on that arraignment notice. Furthermore, unlike the facts in *Doggett,* the government here failed to enter the warrant into any computer system—NCIC or Wales. Thus, even if Wiggins had sought to discover whether there were any outstanding charges pending against him, he would not have discovered the warrant.

When the government requests that a warrant issue, instead of having an arraignment notice sent to the defendant, it has some obligation to ensure that the arrest warrant is executed. Irrespective of whether the final responsibility for executing the warrant for Wiggins' arrest lay

with the U.S. Marshal Service or with Metro Transit Police, the government certainly had an obligation to execute the warrant in a timely manner. While there is no evidence of bad faith in the government's failure to prosecute Wiggins in a timely manner, neither does there appear to be any justifiable reason for the delay. There was a gap in the system. While it appears that neither the U.S. Marshal Service nor Metro Transit Police was aware of this gap, their ignorance does not mitigate the clear neglect in concluding Wiggins' criminal prosecution.

The Court's final inquiry focuses on the prejudice to the defendant caused by the delay in executing the warrant for his arrest. Specifically, the Court is faced with the issue posed in *Doggett* of whether prejudice may be presumed where there is an excessive delay in bringing a defendant to trial. *Doggett* recognized that a defendant may have difficulty making an affirmative showing that the delay weakened his ability to present a defense. The Court cited *Barker* for the proposition that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'" 505 U.S. at 655, 112 S.Ct. 2686 (citing *Barker*, 407 U.S. at 532, 92 S.Ct. 2182). Consequently, the Court held, courts must recognize "that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* While *Doggett* involved a longer delay than is at issue here, the Court cannot but find that the delay in executing Wiggins' warrant has made it more difficult for Wiggins to present a defense.

*Doggett* further suggested that the "prejudice" inquiry is necessarily linked to the question of official negligence in prosecuting a matter in a timely manner.

"While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate how it has prejudiced him." *Id.* at 657, 1992 WL 138505; *see also id.* ("[O]ur toleration of such negligence varies inversely with its protractedness, ... and its consequent threat to the fairness of the accused's trial.") (internal citations omitted).

The Court is convinced that the delay in executing the warrant on Wiggins was prejudicial. The approximately three-year delay in executing the warrant for Wiggins' arrest has prejudiced Wiggins' ability to mount a defense. In particular, the suppression hearing in this matter illustrates the importance of eye witness testimony—both from those witnesses now available and those who may have been available had the warrant been executed in a timely manner. The six Metro Transit officers who were present at Wiggins' arrest gave contradictory testimony at the suppression hearing. For example, the officers' recollection of the lookout description that was broadcast ranged from "Baker male wearing tan pants and a long black coat or jacket," Tr. 3/11/02 at 28–29 (Anderson), to "black male with a tan long coat and, I believe, black pants." Tr. 3/11/02 at 72 (Smalls), and one officer admitted that he could not recall the clothing description. Tr. 3/11/02 at 60 (Foxwell). The disparity in the officers' testimony aptly demonstrates defendant's argument that the delay in prosecuting this case has eroded people's memories of events.

The police officers' testimony also departed from the version of events related in the official police report prepared by Officer Romba and from Officer Romba's grand jury testimony. Clearly, if the defendant had been in a position to present eye-witness testimony, or even cross-ex-

amine the police officers when their memories of events were still relatively fresh, such inquiries might have led to exculpatory evidence.

The government attempts to argue that the defendant would have been unable to locate any witnesses to an event occurring at 7:30 in the evening on a Friday night at Metro Center station. Tr. 3/8/02 at 82 (calling idea that witnesses might be found within two months of the arrest "far-fetched"). However, there is nothing in evidence to persuade the Court that the government's assumption is necessarily correct. Indeed, the Court heard testimony that there were several people on the platform, as well as passengers on the train. While the defendant may not be able to prove that these potential witnesses could and would have testified in a manner beneficial to the defendant, the uncertainty of their testimony proves defendant's point. It is impossible to predict what defense he might have mounted had the government brought him to trial in a timely fashion.

Furthermore, the Metro Transit police officers were allegedly on the scene to arrest Wiggins because a station manager had called the metro transit dispatcher and said that several patrons had reported a man with a gun on a train. Neither the station manager nor the patrons allegedly reporting the presence of an armed man were located by the government, and were thus unavailable for cross-examination by the defendant. The government attempts to twist this situation into prejudice toward the government, suggesting that the absence of the station manager and the patrons only helps the defendant. *See* Tr. 3/8/02 at 80 ("the tipster ... will be a person who could be a very good witness for the government"). Yet, the Court cannot predict what the testimony of these missing witnesses would have been.

Ultimately, as the Supreme Court recognized in *Doggett*, proving specific prejudice to the defendant may become more difficult the longer the delay. The government's inexcusable neglect caused a delay of almost three years in executing the warrant for Wiggins' arrest. More than three years after the incident, defendant is unable to determine what witnesses, if any, were present at the time of his arrest; further, he cannot prove what the benefit might have been derived from the testimony of any additional witnesses. Weighing all of the factors identified by *Doggett*, the Court finds that this matter must be dismissed.

## II. Motion to Suppress

Should doubts persist that Wiggins' constitutional right to a speedy trial was violated by the government's conduct, the Court also finds that the police officers seized Wiggins in violation of his Fourth Amendment rights. Accordingly, this Court grants the defendant's motion to suppress evidence and statements.

### A. Hearing Testimony

Six Metro Transit police officers, as well as a Metro dispatcher, testified at the hearing on defendant's motion to suppress. The dispatcher, Nicole Walker, testified that she received a phone call from a station manager who reported that patrons had reported a man with a gun on a particular Metro train. The dispatcher issued a radio call for Metro Transit police officers to converge on the train. The Metro Center stop was selected as the station at which the officers could most quickly convene.

The dispatcher testified that the lookout description that she broadcast was for: "Baker male, which is a black male, long black jacket, tan pants." Tr. 3/11/02 at 16. The officers generally testified to a similar

sequence of events, in which they heard the dispatcher announce the lookout and the train and car numbers, and convened on Metro Center stop. The officers further testified that they lined up along the platform when the train approached. The officers' testimony was consistent that Officer Tanya Anderson and Officer Jamie Duane Romba were at the sides of the center door of the train car in question when the train approached the platform, and that Officer Jerome Enoch was standing in front of the door with an MP-5, a semi-automatic gun. Officer Linda Foxwell spoke with the train operator when the train approached the station, and Officers Lorenzo Smalls and Shukri Pettegrue were positioned at other places along the train.

There appears to be no disparity that, when the train approached the platform, Officer Anderson announced that she had someone matching the lookout description. However, Officer Anderson and Officer Romba's testimony regarding the subsequent sequence of events is not consistent.

Officer Anderson testified that, after she yelled that she had someone meeting the lookout description, and the doors of the car opened, she identified herself to Wiggins and told him that she needed to speak to him. She said: "I need for you to step over here; you met the description of a lookout." Tr. 3/11/02 at 35. She testified that after she and Wiggins took a few steps, she "saw him reaching with his right hand to go inside of his right coat pocket." *Id.* at 36. Officer Anderson then grabbed his hand and the outside of the pocket. *Id.* Upon feeling something she thought was a gun, she shouted to everyone that she had a gun and told the defendant to get down on the ground. *Id.* at 37–38. She handed the gun back to Officer Foxwell. *Id.* at 61. Only Officer Enoch, who was standing in front of the opening car

doors, corroborated Officer Anderson's statement that Wiggins reached for his right pocket, and that Officer Anderson subsequently grabbed his hand and felt his right pocket. *Id.* at 96. Although Officer Anderson testified that she told Officer Romba, who prepared the police report on the arrest, that she had seen Wiggins reach for his pocket, this information is not contained in the report, and was not part of Officer Romba's testimony to the grand jury.

Officer Romba was standing opposite Officer Anderson when the train car door opened. Officer Anderson testified that she did not recall Officer Romba saying anything, but admitted that she had "tunnel vision" because she was concentrating on making sure that Wiggins understood what she was saying to him. Tr. 3/11/02 at 49–50. Officer Romba, in contrast, testified:

> . . . the doors opened, I immediately told Mr. Wiggins, sir, keep your hands where I can see them. I asked him then to step from the train. He hesitated for a second, he looked at the officer standing there. He then began to step from the train and as he did I placed my hand on his shoulder to guide him to the area that we wanted him to go on the platform.

*Id.* at 125. He explained that, in his experience, using his hand to direct someone "lets people know that you are there and it gives them a second thought about trying to take off or run or something of that nature." *Id.* at 129–30.

Officer Romba further stated that, in asking Wiggins to step off the train, he "us[ed] a firm clear voice rather authoritative in nature." *Id.* at 128. In his police report, he wrote that "[t]he officer ordered the defendant to step out of the train." *Id.* at 140. He testified that he used the word "ordered" "because, to be honest

with you at that point, I didn't feel that I was giving him a choice. Because of the tone in the voice and reflection [stet] that I used it was a direction, I need you to. It wasn't an option and I wasn't making a request. It was more of an order." *Id.* at 141.

Officer Enoch's testimony partially corroborates Officer Romba's testimony. Officer Enoch, who was positioned in front of the opening train car doors, saw Officer Romba standing to the defendant's left, with his right hand on the defendant's back, "basically, directing him off the train." Tr. 3/11/02 at 100. However, Officer Enoch did not hear Officer Romba say anything to Wiggins. *Id.* at 103.

### B. Legal Analysis

█ The Fourth Amendment of the United States Constitution requires that searches and seizures be "founded upon an objective justification" and "governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.'" *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (citing *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Wiggins contends that he was seized unreasonably and in violation of the Fourth Amendment, and moves for suppression of any evidence and statements resulting from his seizure. *See Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

█ A police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). However, "so long as a reasonable person would feel free 'to disregard the police and go about his

business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick,* 501 U.S. 429, 433, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

The government recognizes that it cannot rely exclusively on the anonymous tip allegedly received from Metro patrons, which was relayed to the arresting police officers through the Metro station manager and Metro dispatcher. In *Florida v. J.L.,* the Supreme Court emphasized that there must be some corroboration of an anonymous tip's reliability "in its assertion of illegality, not just in its tendency to identify a determinate person." 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (holding "that an anonymous tip lacking indicia of reliability of the kind contemplated by [*Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)] and [*Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)] does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm"). Consequently, if the Court finds that Wiggins was stopped for an investigatory stop pursuant to *Terry v. Ohio,* the government must show that the officer who stopped Wiggins had a reasonable suspicion of illegal conduct based on factors and observations in addition to the anonymous tip. 392 U.S. at 20–21, 88 S.Ct. 1868.

█ The government does not dispute that Officer Romba clearly intended that Wiggins not feel free to go about his business or to terminate his contact with the police. However, the government argues that Officer Romba's subjective intent is not determinative of the legal status of his interaction with Wiggins. Rather, the government contends that, despite Officer Romba's intent, a reasonable person in

Wiggins' position would have felt free to disregard Officer Romba's instructions. The Court cannot agree. The Court credits the testimony of Officer Romba and Officer Enoch that Officer Romba placed his hand on Wiggins' shoulder in order to move him out of the train. At this same moment, Wiggins was faced by an officer with a semi-automatic weapon. A reasonable person would not have felt at liberty to disobey the officer's instructions to step off the train. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

■ The government further argues that Wiggins' stop was supported by reasonable suspicion arising from Officer Anderson's observation that Wiggins reached for his pocket. However, the testimony clearly indicates that Officer Romba placed his hand on Wiggins as Wiggins "began to step from the train," Tr. 3/11/02 at 125, before Officer Anderson saw Wiggins reach for his right pocket. Officer Anderson testified that Wiggins reached for his pocket only after she and Wiggins had taken some steps away from the train. Thus, while the government contends that this stop was a proper investigatory stop supported by Wiggins' reaching movement, the testimony indicates that Wiggins' seizure occurred before Officer Anderson's observation of Wiggins' reaching movement.

Wiggins was seized within the meaning of the Fourth Amendment when Officer Romba placed his hand on Wiggins and ordered him off the train. As the government has conceded, the anonymous tip from Metro patrons, relayed to the officers via a Metro station manager and Metro dispatcher, cannot support a finding that Officer Romba had a reasonable, articulable suspicion that criminal activity was afoot. With the exception of Officer Anderson's observation of Wiggins' reach for his pocket, the government has not pointed to any other circumstances that would support a finding that any of the officers had a reasonable, articulable suspicion that Wiggins was engaged in criminal activity before Officer Romba stopped Wiggins. Consequently, Officer Romba's stop of Wiggins was unconstitutional, and the fruits of that seizure must be suppressed.

## CONCLUSION

The government's failure to execute the warrant for Wiggins' arrest for almost three years clearly prejudices Wiggins' ability to mount a defense to the charges against him. The Court recognizes that dismissal of a case is an extreme remedy, but no action short of dismissal will cure the blatant violation of Wiggins' constitutional right to a speedy trial.

Accordingly, for the foregoing reasons and upon careful consideration of the defendant's motions, the responses and replies thereto, the testimony heard on March 8, 2002 and March 11, 2002, and the applicable statutory and case law, it is hereby

**ORDERED** that defendant's motion to dismiss for violation of his constitutional right to a speedy trial is **GRANTED;** and it is

**FURTHER ORDERED** that defendant's motion to suppress evidence and statements is **GRANTED.**

**IT IS SO ORDERED.**